## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **NANCY MASON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-CV-2282** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#14) filed by the Defendant, Board of Trustees of the University of Illinois. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Defendant's Motion for Summary Judgment (#14) is DENIED.

## FACTS[1]

## I. EMPLOYMENT BACKGROUND

Plaintiff, Nancy Mason, is a female and was born on May 6, 1953.[2] Plaintiff was employed at the University of Illinois in various capacities from 1981 to August 15, 2011, including as a firefighter, EMT, and Program Director of Hazardous Materials and Terrorism

---

[1]The facts are taken from the parties statement of undisputed facts and the documents submitted by the parties, including the Plaintiff's and Jaehne's deposition transcripts. This court has only included facts which are adequately supported by evidence in the record.

[2]Plaintiff therefore was 52 years old in December 2005, at the beginning of the alleged adverse employment actions.

for the Illinois Fire Service Institute ("IFSI"). In 1997, Richard Jaehne ("Jaehne") was hired to lead IFSI, a position he currently maintains. Jaehne's official title at IFSI is Director, and in that role he is ultimately responsible for hiring, promotions and other personnel decisions at IFSI. At the time Jaehne arrived at IFSI, both the Plaintiff and Dave Clark ("Clark") worked at IFSI and held the title of Fire Education Specialists. At some point after Jaehne's arrival, Clark was promoted to the position of Deputy Director at IFSI, a position which had a supervisory role over Plaintiff. Jaehne also hired John "Mac" McCastland ("McCastland") as an Assistant Director, sometime prior to 2005. In 2005, McCastland was promoted to the position of Associate Director at IFSI.[3]

Prior to the demotions that are at issue in this case, Plaintiff's primary responsibility as Program Director was to manage the Hazardous Materials and Terrorism programs, in addition to other related responsibilities. Plaintiff held these positions for a period of time, however it appears that she received these roles at IFSI during Jaehne's tenure. During Plaintiff's time as Program Director, she had a staff that worked for her to assist her in completing her administrative responsibilities. In either late 2004 or early 2005, while Plaintiff was responsible for these programs, she requested additional help. In response to that request, Plaintiff was appointed chairperson of a search committee with the purpose of finding someone to fill her request for additional help. The committee recommended that Chris Downey ("Downey") be hired for the position. The stated role for Downey's position was to become trained in Plaintiff's area of expertise—namely the Hazardous Materials

---

[3]The positions of Assistant Director and Associate Director are both "senior leadership" roles which are above the position of Program Director in the IFSI hierarchy.

program—with the goal that he would eventually take on Plaintiff's role if his development in the position was successful.[4]  At the time he was hired, which was in April 2005, he was approximately thirty years old and had previously worked for four years as a part-time volunteer fireman at the Hickory Point Fire Department; however he had no prior experience working in a university setting.  After Downey was hired, he reported directly to Clark, which allegedly came as a surprise to the Plaintiff.

## II.  ALLEGED ADVERSE EMPLOYMENT ACTIONS

On August 9, 2005, Plaintiff received feedback from Jaehne regarding her job performance for the preceding year in her yearly Academic Professional Review.  Jaehne complemented Plaintiff in the review on her development of the Hazardous Materials program and on her ability to generate ideas.  However, Jaehne criticized her performance with regards to three areas: (1) the compatibility of the Hazardous Materials program with the other programs at IFSI; (2) the need to re-focus her efforts on program development and quality control and connectivity to the Office of Domestic Preparedness ("O.D.P.") guidelines; and (3) the need to reduce personality conflicts and become a better part of the team.[5]  At about the same time Plaintiff received this performance evaluation, Plaintiff

---

[4]It appears that Downey was selected for the position in part because he was young—presumably because of the goal that upon Plaintiff's departure from her position, presumably upon retirement, he would be able to take over her role.

[5]Jaehne explained in his deposition that it was not uncommon for him to provide negative comments or constructive criticism in performance reviews.

received a letter from Jaehne adjusting and increasing her salary[6] and thanking her for her services as follows: "Your performance has clearly demonstrated significant merit. . . . I want to thank you for your numerous important contributions to the Institute . . . You have truly contributed to make a difference."

In her role as the Program Director for Hazardous Materials, Plaintiff was responsible, in part, for developing curriculum that met the requirements of the United States Department of Homeland Security. In October 2005, portions of the curriculum that Plaintiff was responsible for—namely the course titled "SWR: Hazardous Materials Operations"—failed to meet the standards for state and local training programs.

At some point in the months preceding December 2005, Jaehne, in his monthly meetings with the Executive team—which included Clark, McCastland, Marcia Miller, and Terry Hopper—discussed the possibility of removing Plaintiff from her Program Director roles. Thereafter, in December 2005, Jaehne advised the Plaintiff that she was being relieved of her title as Program Director of Hazardous Materials and Terrorism, apparently explaining that the reason for this change was his lack of trust in Plaintiff and his dissatisfaction with her management of the programs. At this meeting, Plaintiff was also informed that her replacement as Program Director would be Downey, who had recently been hired to assist the Plaintiff. Although the exact timing is not clear from the parties filings, Plaintiff apparently continued, if not in title, at least in partial responsibility, for the Hazardous Materials and Terrorism Programs until March 2006, when those responsibilities, along with

_____

[6]Plaintiff's annual administrative increment was moved to her base salary (which is not necessarily a salary increase) and she also received a small $820 salary increase.

the vast majority of her previous responsibilities, were formally taken away. After Downey took over the role of Program Director of Hazardous Materials, he was not initially certified to sign student certificates for all of the programs that he now managed. Therefore, Plaintiff, even after her removal from her role as Program Director, was needed to continue signing student certificates for various programs.

At the time of her reassignment in March, Plaintiff was put in charge of curriculum development (which was a leading priority for IFSI), her sole responsibility at this point. Specifically, Plaintiff agreed to complete portions of the Hazardous Materials curriculum by May 31, 2006, for resubmission of the curriculum to the Department of Homeland Security Grants & Training. Plaintiff explains that she believed that this assignment to develop the weapons of mass destruction curriculum had been originally assigned to Brian Brauer ("Brauer") in the Spring of 2004. Plaintiff explains that this project was reassigned to her because it was not completed by Brauer, who was later promoted to Assistant Director in spite of this alleged failure. Plaintiff had a clear deadline to complete this project by May 31, 2006. However, Plaintiff, allegedly due to her brief hospitalization, was unable to complete at least one section of this curriculum and turned it in four days late. Jaehne considered this failure to fully complete the assigned curriculum to be a performance failure.

In July 2006, Plaintiff was moved into a smaller office at IFSI to allow McCastland to utilize her office. Also, in July, Plaintiff met with Dr. McCoy, the head of the Department, Jaehne and Clark to discuss the allegations that Plaintiff was not adequately performing her job. After a brief meeting, Jaehne and Clark left the meeting and Dr. McCoy continued to

have a meeting individually with Plaintiff. According to the Plaintiff, during this private meeting with Dr. McCoy, Plaintiff was offered the opportunity to leave her position at IFSI and work for another department at the University of Illinois if she agreed not to file a grievance relating to her demotion at IFSI. Plaintiff agreed, and as a result, in August 2006, Plaintiff accepted the position of Grant Development Specialist for the University of Illinois Institute of Aviation, Police Training Institute, and IFSI.

After Plaintiff's reassignment to the Institute of Aviation, in November 2006, there was an email exchange between Lian Ruan, the head librarian at IFSI, and the Plaintiff regarding materials that were either missing or on "permanent" loan to Plaintiff from the library. Plaintiff was offended by what she believed was an accusation that she deliberately kept books that belonged to IFSI. Additionally, during this same time period, Plaintiff believes that her office at the Institute of Aviation was "ransacked" by "people" from IFSI at the direction of Jaehne, although it is not clear what damages Plaintiff suffered, if any, beyond her personal belief that she was being discriminated against by Jaehne.

In her new role as a Grant Development Specialist, Plaintiff worked for Virginia Davis, a female, who was a personal friend of McCastland. Thereafter, in 2007, Plaintiff received a bad performance review by Davis for her work at the Institute of Aviation. This review gave Plaintiff thirty days to improve her performance or be terminated. Plaintiff complained about this review and thereafter it was removed from her personnel file. Thereafter, Plaintiff was removed from Davis' supervision.

### III.  COMPLAINTS OF DISCRIMINATION

Plaintiff alleges that she first met with an individual from the University of Illinois Academic Human Resources Office to inquire about her situation at IFSI in January 2006—explaining at this time that she believed she was being singled out because of her gender.  Plaintiff scheduled this meeting at an area restaurant to avoid any appearance that she was attending such a meeting.  Plaintiff had a follow-up meeting after this initial meeting in February 2006.  Despite these two initial meetings to discuss her concerns of gender discrimination, Plaintiff decided not to file a grievance, allegedly out of fear of losing her job with IFSI.  In March 2006, Plaintiff returned to the Academic Human Resources Office and for the first time explained that she now believed she was also being discriminated against based on her age.  Plaintiff statement of undisputed facts does not indicate that there were any subsequent conversations with the Academic Human Resources Office after March.  Also, Plaintiff's deposition testimony indicates that she never complained directly to any individual at IFSI of age or gender discrimination.  Finally, Plaintiff acknowledged in her deposition that she never filed a grievance with the Academic Human Resources Office.

## IV.  ALLEGED GENDER AND AGE-RELATED COMMENTS[7]

Plaintiff supports her allegations of gender discrimination solely on the basis of Associate Director McCastland's alleged inappropriate gender-related statements.  Specifically, Plaintiff's deposition testimony explains that McCastland's inappropriate

---

[7]This section is disputed—Plaintiff asserts that the following statements were made by employees of IFSI, however Defendant disputes their validity.  Nevertheless, given Plaintiff's sworn deposition testimony, at the summary judgment stage credibility determinations are inappropriate, thus the court must consider Plaintiff's version of the events as what actually occurred.

statements were as follows:

> He referred to [another employee] as a lesbian in a zoot suit at a staff meeting in January of 2005. He referred to the sexual harassment workshop that we had as being a joke, unprofessional joke. He referred to women on the telephone that were secretaries in a sexual manner, referring to them in endearing terms that are inappropriate like sweetie, darling.

Plaintiff does not allege any other individual discriminated on the basis of gender or made any gender inappropriate comments. With regards to the age discrimination claim, in her deposition the Plaintiff explained that there were two age-based discriminatory comments made by IFSI senior leadership.[8] Specifically, she explained Jaehne's comments to her in a meeting in June 2006, as follows:

> He said that . . . not everybody gets to keep their job as they get older, that . . . just because it was getting easier didn't mean that I should keep the job that I had working the hazardous materials program and that he wanted me to take on a different responsibility from the hazardous materials program, and then he described the fact that he wanted me to go out and get money and work toward . . . bringing in additional funds for the Fire Service Institute for all the programs.

Plaintiff also testified in her deposition that Jaehne, and Clark, had made comments to her that age had been a factor in Jaehne's decision to remove her from the Program Director roles. Specifically, Plaintiff's deposition testimony is as follows:

> It was the fact that during the meeting in March and the meeting in August Dave specifically–Dick talked about it, about my age being a factor in the decision to remove me from the program and not represent the Institute anymore, and then in August it was Dave Clark who made reference to the fact that–that Chris Downey was a younger person and should be representing the program.

---

[8]Plaintiff's deposition testimony at times seems to be inconsistent on the dates of these statements and the number of statements made. At one point in the deposition, Plaintiff affirmatively responded that Jaehne only made one statement that led Plaintiff to believe age was a factor in the decision to remove her titles as Program Director. (Plaintiff's Dep. 122–23).

## PROCEDURAL BACKGROUND

In June 2008, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff alleged that she was discriminated against because of her gender and age. In responding to the EEOC, Defendant explained that Plaintiff was demoted because: (1) she failed to submit courses to the Department of Homeland Security and that some of the courses submitted were not approved; (2) she had not updated the test for state certifications with the state fire marshal; (3) police commanders said they could not work with her; and (4) she allegedly made offensive comments at a training session in February 2006. On August 21, 2009, the EEOC sent Plaintiff a Notice of Right to Sue. On November 19, 2009, Plaintiff filed her Complaint (#1) in this court. On December 28, 2009, Plaintiff filed her First Amended Complaint (#3), which contains the following counts against the Defendant: (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (2) retaliation in violation of Title VII; (3) age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended ("ADEA"); and (4) retaliation in violation of the ADEA.

In Defendant's answer to Interrogatories, the reasons provided for Plaintiff's demotions were as follows: (1) she resisted staff changes; and (2) failed to carry out directives with respect to: (a) use of parallel systems; (b) budgetary guidelines; (c) working with the State Police; (d) working on the terrorism task force; and (e) working on curriculum and MFPA programs. In Jaehne's deposition, he provided a variety of reasons for Plaintiff's demotion, but explained that the statement at a training session in February 2006 was not the

reason for demotion.

On August 30, 2011, Defendant filed a Motion for Summary Judgment (#14) and attached supporting exhibits. On September 23, 2011, Plaintiff filed a Response (#15) to the Motion for Summary Judgment. On October 6, 2011, Defendant filed its Reply (#16).

## ANALYSIS

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929 (citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998)).

Therefore, the nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th

Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23. "Conclusory allegations not supported by the record are not enough to withstand summary judgment." Basith v. Cook Cnty., 241 F.3d 919, 928 (7th Cir. 2001).

Nevertheless, uncorroborated testimony from the non-movant, even if self-serving, can be evidence of disputed material facts and therefore prevent summary judgment, as long as such testimony is based on personal knowledge or firsthand experience. Berry v. Chicago Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010). Moreover, "[i]t is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders." Id.

## II. GENDER DISCRIMINATION CLAIM

Under Title VII of the Civil Rights Act of 1964, an employer is prohibited from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs alleging sex discrimination in employment under Title VII can proceed under either: (1) the direct method; or (2) the indirect, burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Petts v. Rockledge Furniture LLC,

534 F.3d 715, 720 (7th Cir. 2008).  Plaintiff argues that there is sufficient evidence of discrimination to proceed under either method, so this court will discuss each in turn.

## A.  Direct Method

Under the direct method, gender discrimination may be demonstrated by two types of evidence: direct evidence and circumstantial evidence.  Volovsek v. Wisconsin Dep't of Agric., Trade & Consumer Prot., 344 F.3d 680, 689 (7th Cir. 2003).  First, the Seventh Circuit has described direct evidence as "evidence, which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption."  Id. ("This evidence of the I-am-not-promoting-you-because-you-are-a-women type is understandably rare.").  Circumstantial evidence of discrimination, on the other hand, allows a plaintiff to prevail "by constructing a convincing mosiac of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker."  Petts, 534 F.3d at 720 (internal quotations omitted).  The Seventh Circuit has recognized three different types of circumstantial evidence of intentional discrimination, which have been explained as follows:

> The first and most common consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from with the inference of discriminatory intent might be drawn.  The second type is evidence that similarly situated employees outside the protected class receive systematically better treatment.  The third is evidence that the plaintiff was qualified for the job in question but [was] passed over in favor of a person outside the protected class and that the employer's stated reason is a pretext for discrimination.

Id. at 720–21 (citing Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 1994) (internal quotations omitted)).  In this case, Plaintiff does not argue that there is any direct

evidence that she was demoted based on her gender. However, Plaintiff argues that there are two types of circumstantial evidence that are sufficient, when considered together, to create a "convincing mosiac of circumstantial evidence" that would allow a jury to infer intentional discrimination by Defendant. This court will address each type of circumstantial evidence that Plaintiff argues exists in this case, however as discussed below, there is insufficient circumstantial evidence to create a genuine issue of material fact that Defendant was intentionally discriminated against based on her gender.

### 1. Derogatory Gender-Based Comments

First, Plaintiff argues that McCastland, who was on the Executive Committee, made derogatory comments about or directed at women. The Seventh Circuit has explained that a "remark can raise an inference of discrimination when it was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." Petts, 534 F.3d 721. If the plaintiff is unable to show that the remarks were related to the adverse employment action, the remarks alone will fail to give rise to an inference of discrimination, even if they were made by the ultimate decision maker. Fuka v. Thompson Consumer Elec., 82 F.3d 1397, 1403 (7th Cir. 1996). In this case, even if McCastland did in fact make the alleged gender discriminatory comments,[9] and it is assumed that his place on the Executive Committee allows him to be considered the decision maker in Plaintiff's

---

[9]Plaintiff alleges that McCastland made the following gender based statements: (1) he referred to a human resources professional as a "lesbian in a zoot suit"; (2) he called women who he was speaking with on the phone "honey" or "sweetie"; and (3) he said that sexual harassment training was a joke. Although Plaintiff also discusses an alleged statement that McCastland said that women have no place in the fire service, this was not contained in Plaintiff's list of material disputed or undisputed facts.

demotion,[10] it is clear that the statements have no connection whatsoever with her claimed adverse employment action. Calling another women "honey" or a "lesbian in a zoot suit," although obviously inappropriate, is not related to Plaintiff's adverse employment action, therefore there is no permissible inference of gender discrimination in this case.

## 2. Systematically Better Treatment

Plaintiff argues that there is sufficient evidence to support an inference that similarly situated male employees were <u>systematically</u> treated better than her by the Defendant. In order to consider this argument, this court must first determine if there are similarly situated male employees that can be compared with Plaintiff. "The plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct, and that the other employee had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." <u>Walker v. Bd. of Regents of Univ. of Wisconsin</u>, 410 F.3d 387, 396 (7th Cir. 2005).

Plaintiff argues that the following four male employees received better treatment than she did by the Defendant: (1) McCastland; (2) Clark; (3) Brauer; and (4) Downey. Plaintiff is unable to show that she is similarly situated with McCastland or Clark because these

---

[10]This assumption certainly is questionable in this case, as McCastland would be unlikely to considered Plaintiff's supervisor, as defined by Title VII. A supervisor, under Title VII, is "someone with power to directly affect the terms and conditions of the plaintiff's employment." <u>Rhodes v. Illinois Dept. of Transp.</u>, 359 F.3d 498, 506 (7th Cir. 2004). Here, Plaintiff only claims that McCastland was a member of the Executive Committee, which had input in Jaehne's decision to terminate Plaintiff. McCastland, by himself, lacked any power which would qualify him as Plaintiff's supervisor. <u>See Hall v. Bodine Elec. Co.</u>, 276 F.3d 345, 355 (7th Cir. 2002). Moreover, from the facts offered, it is unlikely McCastland's bias could be imputed to Jaehne on the basis that McCastland had a significant influence on the ultimate decision. <u>See Porter v. Illinois Dept. of Children & Family Serv.</u>, 165 F.3d 32 (7th Cir. 1998).

individuals undisputedly have different qualifications and positions. McCastland was initially hired as an Assistant Director, a position above the Plaintiff, and was later promoted to the position of Associate Director. He was hired, and later promoted, based on his ability to be the direct representative of IFSI in the Chicago market, a job completely distinct from Plaintiff's role in IFSI. Moreover, Plaintiff offers no facts allowing for a meaningful comparison between her own performance, conduct or experience with that of McCastland. Clark, on the other hand, did have the same position as the Plaintiff at the time Jaehne took over as the director of IFSI—Fire Education Specialist. Clark was thereafter promoted to Deputy Director by Jaehne at a time well prior to the time frame in which Plaintiff was demoted. Also, Clark specifically was chosen for his promotion because he had experience as a fire chief, and as a result, had experience across each discipline IFSI offered— experience Plaintiff lacks. Plaintiff offers no other facts allowing for a meaningful comparison between her own performance, conduct or experience with that of Clark.

On the other hand, Brauer and Downey are similarly situated, at least in certain aspects. According to the Plaintiff,[11] Brauer was assigned the task of completing curriculum for weapons of mass destruction in the Spring 2004. After Brauer had failed to complete this task, Jaehne reassigned this task to Plaintiff in December 2005, asking her to complete it by June 2006. Despite Brauer's alleged "failure" to complete this task, he was nevertheless promoted to Assistant Director at IFSI. Therefore, as Plaintiff failed to meet a deadline for

---

[11]Each of these factual assertions is directly contradicted by Defendant. However, this court is unable to make credibility determinations, no matter how seemingly unlikely it is that Plaintiff had a better understanding of other employees' responsibilities than Jaehne, who was the Director of IFSI.

completing curriculum, Brauer, if he did in fact also miss a deadline on the same project, would be similarly situated (at least with regards to this particular conduct). Plaintiff offers no other facts allowing for a meaningful comparison with Brauer's qualifications or performance on other projects.

Finally, Downey is the individual that took Plaintiff's position after she was demoted. It is undisputed that he did not have similar qualifications for the position. However, there are no facts offered that indicate that Downey had any performance problems during his limited time working for IFSI prior to his assumption of Plaintiff's responsibilities. Nevertheless, for purposes of this analysis, this court will assume that Downey is similarly situated, as Plaintiff argues. Therefore, in this case, construing the available evidence in the light most favorable to the Plaintiff, and drawing all reasonable inferences in her favor, there would only be two (arguably) similarly situated male employees—Brauer and Downey. Each of these men was promoted at some point during the time Plaintiff's worked for Jaehne. Even assuming that these two men received better treatment than the Plaintiff, the evidence Plaintiff has offered fails to support a finding that Defendant <u>systematically</u> treated similarly situated men better than her.

Specifically, even if this court determined that Brauer and Downey were similarly situated, the alleged better treatment must have occurred "on a regular and repeated basis." <u>Rogers v. White</u>, 2011 WL 4349464, at *5 (7th Cir. 2011). In this case, even assuming Plaintiff's allegations are true, there are only two instances where a similarly situated male was promoted. The Seventh Circuit has explained that a simple statistical correlation

between gender and an employer's decisions is not evidence of causation. Specifically, the court explained:

> Because the occurrence of adverse employment actions may correlate to [certain] employees for reasons other than intentional discrimination, causation is suggested only when the other variables are shown to be insignificant. Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination. A plaintiff must show disparate treatment between comparable individuals.

Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616–17 (7th Cir. 2000). Even in cases where a plaintiff offers evidence allowing for a statistical analysis, such evidence often fails to withstand summary judgment without supporting evidence of discrimination. See e.g., Rummery v. Illinois Bell Tel. Co., 250 F.3d 553, 559 (7th Cir. 2001) ("To establish disparate treatment, the statistics must be accompanied by other evidence."); Sun v. Bd. of Tr. of Univ. of Illinois, 473 F.3d 799, 813 (7th Cir. 2007) ("We do not hold . . . that a questionable pattern of promotion, standing alone, is sufficient evidence to withstand summary judgment."). Here, evidence that two men were promoted while Plaintiff was demoted fails to rise to the level of systematic better treatment for men at IFSI. Moreover, even assuming this was sufficient statistical evidence, there is no other evidence of Jaehne's disparate treatment of women. In conclusion, Plaintiff has failed, as a matter of law, to establish gender discrimination under the direct method.

## B. Indirect Method

To establish a *prima facie* case of gender discrimination under the indirect method, Plaintiff must show that: (1) she was a member of the protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and

(4) the defendant treated similarly situated employees outside of the protected class more favorably.  See Volovsek, 344 F.3d at 692.  If a plaintiff can establish all four elements of her *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  If the defendant meets this burden, the plaintiff must attempt to show that the defendant's stated reasons for the adverse employment action are pretextual—which means that the defendant's explanation is false and discrimination was in fact the real reason for the adverse employment action.  Id.  In this case, Defendant concedes that Plaintiff, as a female, is a member of a protected class and that her demotion constitutes an adverse employment action.  However, Defendant argues that Plaintiff has failed to satisfy the *prima facie* case because she was not meeting legitimate expectations and has failed to show that Defendant treated similarly situated male employees more favorably.  Additionally, Defendant argues that even if Plaintiff can make out her *prima facie* case of gender discrimination, Plaintiff is unable to show that Defendants stated reasons for the adverse employment action are pretextual.

### 1. *Prima Facie Case*

In this case, Plaintiff initially had her title as Program Director removed in December 2005.  Therefore, for purposes of summary judgment, this court will not consider any performance failures after December 2005.  This initial adverse action was taken only a few months after Plaintiff had received a performance evaluation and small raise from the Defendant in early August.  Although there were some negative comments in the performance evaluation, there were also several positive comments, therefore a jury could

infer that at least as of August 2005, Plaintiff was meeting her employer's legitimate expectations. Defendant points to the disapproval of certain courses that Plaintiff was responsible for on October 24, 2005, as being a crucial deficiency at the time her responsibilities as Program Director were removed. However, Plaintiff argues that when her responsibilities were removed, this was not mentioned as the part of the basis for the decision. Therefore, with the benefit of all reasonable inferences, this court finds that Plaintiff was meeting her employer's legitimate expectations.

Also, Defendant argues that Plaintiff has failed to show that similarly situated male employees were treated more favorably. Plaintiff argues that Downey, her replacement, who undisputedly had much less experience, should be considered similarly situated by this court. Defendant contends that there are no available similarly situated individuals because the performance failures and inability to work with others was unique to the Plaintiff. However, the Seventh Circuit has explained that "an inflexible rule requiring plaintiff to point to a similarly situated comparator would automatically doom a suit by . . . any employee who is the sole occupant of a particular job class at her employer." See Pantoja v. American NTN Bearing Mfg. Corp., 495 F.3d 840, 846 (7th Cir. 2007). In that type of case, the Seventh Circuit allows a plaintiff to survive summary judgment if they are able to demonstrate that they are meeting their employer's legitimate expectations and that the employer needs to find another person to perform the plaintiff's job. See id. In this case, Plaintiff occupied a position unique from any other employee at IFSI—she was the Program Director of Hazardous Materials and Terrorism. Also, IFSI immediately found a replacement to fill

Plaintiff's position as Program Director. Therefore, this court finds that this is the type of case where an inflexible approach to the similarly situated element would be inappropriate. As a result, because this court has found that Plaintiff has offered evidence that would allow a jury to find that she was meeting Defendant's legitimate performance expectations, and she was immediately replaced, this court finds that Plaintiff has satisfied the *prima facie* case of gender discrimination.

### *2. Pretext*

Plaintiff is able to establish all four elements of her *prima facie* case, therefore the burden shifts to the Defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. Defendant clearly satisfies this burden by providing a variety of nondiscriminatory reasons for Plaintiff's demotion, namely a few performance failures by the Plaintiff and allegations of improper conduct in a class. Therefore, Plaintiff must attempt to show that Defendant's stated reasons for the adverse employment action are pretextual—which means that the Defendant's explanation is false and discrimination was in fact the real reason for the adverse employment action. Plaintiff lacks direct evidence that Defendant's reason for firing her was actually based on her gender—thus she must rely on indirect evidence to demonstrate pretext. The Seventh Circuit has explained:

> "If a plaintiff lacks direct evidence [that the employer's stated reason for an employment action is dishonest and that the true reason was based on discriminatory intent], [s]he may use indirect evidence and *must show that the stated reason is not credible and is factually baseless*, and [s]he ultimately must be able to point to some circumstances from which an inference can be drawn that the real reason for the employment action was discriminatory."

McGowan v. Deere & Co., 581 F.3d 575, 581 (7th Cir. 2009) (emphasis added). However, if

an employer "gives one reason at the time of the adverse employment decision but later gives another which is unsupported by the documentary evidence, a jury could reasonably conclude that the new reason was a pretextual, after-the-fact justification." O'Neal v. City of New Albany, 293 F.3d 998, 1005–06 (7th Cir. 2002).

Plaintiff alleges that when she was first told she was going to be demoted, it was because Jaehne did not trust her. Later, it is undisputed that other reasons were given by the Defendant for her demotions, some of which are conceded by the Plaintiff to be true.[12] Nevertheless, Plaintiff argues that changes in Defendant's reasoning for demoting her is evidence of pretext entitling her to a trial on this issue. Although a jury may find that each of the reasons offered by the Defendant for Plaintiff's termination are completely accurate and supported by evidence, a reasonable jury could find that the changing justifications offered by Defendant for Plaintiff's demotion supports an inference that Defendants were trying to cover-up discriminatory motives. Therefore, because there is a genuine issue of material fact with regards to whether or not Defendant's stated reasons for Plaintiff's demotion were pretextual, and Plaintiff has satisfied the *prima facie* case under the indirect method, this court finds that summary judgment is not appropriate on Plaintiff's gender discrimination claim.

## III. ADEA CLAIM

---

[12]First, at least one section of a curriculum submission was submitted at least four days after the deadline set by Jaehne for its completion. Second, Plaintiff was responsible for certain portions of curriculum materials that failed to meet standards for state and local training programs. These two stated reasons certainly are not factually baseless, and are in fact admitted as factually correct by the Plaintiff.

The ADEA provides, in relevant part, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). The United States Supreme Court has held that it is not sufficient for a plaintiff in an ADEA case to show that age was a motivating factor and must, instead, demonstrate "that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., Inc., ___ U.S. ___, 129 S. Ct. 2343, 2352 (2009); see also Mach v. Will Cnty. Sheriff, 580 F.3d 495, 498 (7th Cir. 2009). A plaintiff can attempt to demonstrate discrimination under either the direct or indirect method of proof. Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 695 (7th Cir. 2006). In this case, although Plaintiff solely advanced an argument under the indirect method for her age discrimination claim, this court will solely focus on the direct method of proof because there is sufficient direct evidence of age discrimination to preclude summary judgment on Plaintiff's ADEA claim.

"When proceeding under the direct proof method, in order for allegedly discriminatory remarks to qualify as direct evidence of discrimination, the plaintiff must show that the remarks were related to the employment decision in question." Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1089 (7th Cir. 2000) (internal citation omitted). Plaintiff's evidence, specifically her deposition testimony, satisfies this standard. In her deposition, Plaintiff explained that both Jaehne and Clark made remarks to her about how her age contributed to the decision to remove her from the Hazardous Material and Terrorism Programs. Her statements were as follows:

It was the fact that during the meeting in March and the meeting in August Dave specifically–Dick talked about it, about my age being a factor in the decision to remove me from the program and not represent the Institute anymore, and then in August it was Dave Clark who made reference to the fact that–that Chris Downey was a younger person and should be representing the program.

This testimony by Plaintiff, when viewed in the light most favorable to her, is direct proof that Jaehne, her supervisor, considered age when making the decision to demote her. Moreover, even if Jaehne's statement was not made at the time Plaintiff was initially removed from her position of Program Director, they were made only a few months later, by the decision maker, and directly referred the adverse employment action complained of. See Mach, 580 F.3d at 499 (explaining than even a stray remark is sufficient to create an inference of discrimination if "if (1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action."); Olson v. N. FS, Inc., 387 F.3d 632, 635 (7th Cir. 2004) ("A statement can be direct evidence of discriminatory intent where the statement is made around the time of and in reference to the adverse employment action."). Because there is sufficient direct proof of age discrimination, there is no need to consider the indirect method of proof, as summary judgment is improper on Plaintiff's ADEA claim.

## IV. RETALIATION CLAIMS[13]

Employers are prohibited from retaliating against an employee for complaining about discrimination that violates Title VII or the ADEA. 42 U.S.C. § 2000e-3(a); 29 U.S.C. §

---

[13]Plaintiff has brought two separate counts of retaliation in this case—one based on complaints of gender discrimination and another based on complaints of age discrimination—however, at least for summary judgment purposes, the parties have chosen to discuss these as a single claim, so this court will do the same.

623(d).  WHAT ABOUT AGE??  A *prima facie* case of retaliation may be satisfied using either the direct method or indirect method.  <u>Sitar v. Indiana Dept. of Transp.</u>, 344 F.3d 720, 728 (7th Cir. 2003).  In this case, Plaintiff argues that she can satisfy both methods, thus this court will consider each method in turn.

## A.  Direct Method—Retaliation

First, to satisfy the direct method of a retaliation claim, the plaintiff must present direct evidence that: (1) she engaged in a statutorily protected activity; (2) an adverse action was taken by her employer; and (3) there was a causal connection between the activity and the adverse action.  <u>Id.</u>  Defendant does not dispute that Plaintiff engaged in statutorily protected activity when she reported the alleged discrimination to the University of Illinois Academic Human Resources Office.  However, she first engaged in this protected activity in January 2006.  This was after Plaintiff was already informed that she was going to be replaced as Program Director of Hazardous Materials and Terrorism.  Therefore, the claimed adverse actions taken by IFSI in retaliation importantly do not include the initial demotion of Plaintiff from her role as Program Director.

As a general rule, there cannot be a causal connection between the protected activity and the adverse action if the employer was unaware of the protected activity.  <u>Dey v. Colt Constr. & Dev. Co.</u>, 28 F.3d 1446, 1458 (7th Cir. 1994).  Nevertheless, a plaintiff may rely upon circumstantial evidence to establish that an employer was aware of the protected activity.  <u>Id.</u>  In <u>Dey</u>, the court found even though there was no evidence that the decision maker had any knowledge of the protected activity, the fact that the discharge came only four

weeks after the protected activity and less than two weeks after a significant raise supports an inference of knowledge. <u>Id.</u> at 1459. In this case, Plaintiff makes no argument that Defendant was aware of her protected activity at the time of any adverse action. In fact, it appears that Plaintiff affirmatively took steps to avoid detection of her complaints, such as deciding not to file a formal grievance in January and February 2006, or for that matter at any time, despite meeting with the Academic Human Resources Office on multiple occasions. Moreover, there is no circumstantial evidence supporting a finding that Jaehne was aware of Plaintiff's protected activity. In contrast to <u>Dey</u>, it is clear that Jaehne was dissatisfied with Plaintiff's work performance well before Plaintiff ever complained of gender or age discrimination. Here, it is undisputed that Plaintiff had her title as Program Director removed prior to January 2006—the first time any complaint was made by the Plaintiff. Therefore, because the Plaintiff is unable to offer even circumstantial evidence of a causal connection between her protected activity and the alleged adverse actions, Plaintiff fails to demonstrate a *prima facie* case of retaliation under the direct method.

### B. Indirect Method—Retaliation

To satisfy the indirect method of a retaliation claim, "the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." <u>Sitar</u>, 344 F.3d at 728. If the plaintiff is able to successfully establish these elements, the defendant then has

the burden to come forward with a legitimate, non-invidious reason for the adverse action. Id. Finally, if the "defendant presents a legitimate, non-invidious reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." Id. Defendant argues that summary judgment is appropriate on Plaintiff's retaliation claims because: (1) there are no facts supporting a finding that Plaintiff suffered an adverse action in retaliation for her protected activity; and (2) Plaintiff cannot demonstrate that Plaintiff performed her job according to the Defendant's legitimate performance expectations. This court will limit its analysis to these arguments made by the Defendant.[14]

Generally, the types of actions which are forbidden by an employer against an employee must be "with respect to [the employee's] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1); Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 743–44 (7th Cir. 2002).[15] However, the Seventh Circuit has explained that "[r]etaliation claims often take a more generous view of what events constitute actionable claims." Volovsek, 344 F.3d at 688 n.5. However, a plaintiff complaining of retaliation must demonstrate that "some action on the employer's part . . . cause[d] her to suffer a real

---

[14]Therefore, this court will not consider whether there were legitimate reasons for her demotion or whether or not the stated reasons were pretextual.

[15]The Seventh Circuit has explained that there are three groups of cases in which the statutory criterion can be satisfied: (1) cases where the employee's financial terms of employment are diminished (i.e. compensation; fringe benefits); (2) cases where a "nominally lateral transfer" or a change of responsibilities significantly reduces the employee's career prospects, but does not immediately have financial consequences; and (3) cases where the employee's work conditions "are changed in a way that subjects [her] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace." Herrnreiter, 315 F.3d at 744–75.

harm." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 902 (7th Cir. 2002); Crady v.
Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993) (providing
examples of "termination of employment, a demotion evidenced by a decrease in wage or
salary, . . . [or] significantly diminished material responsibilities . . . ."). For instance, a
negative performance evaluation, that is unaccompanied by any tangible negative job
consequence, does not constitute an adverse employment action. Grube v. Lau Indus., Inc.,
257 F.3d 723, 729 (7th Cir. 2001).

In this case, there are four actions which Plaintiff alleges are adverse employment
actions taken in retaliation for her protected activity: (1) removal of her responsibilities at
IFSI in March 2006; (2) an alleged search of her office; (3) an accusation that she had failed
to return books to the IFSI library accompanied with a threat of police involvement; and (4) a
poor performance review by Davis after Plaintiff left IFSI. The latter three actions are clearly
not actionable events—Plaintiff has not argued that she actually suffered any real harm from
these actions—as the poor performance review was removed from her file, no police
involvement actually ensued (if it was actually threatened), and there is no claim that Plaintiff
suffered any harm from the search of her office. However, there only needs to be one
adverse employment action to satisfy the *prima facie* case—therefore, the removal of
responsibilities in March, which arguably did limit her career prospects, is sufficient to
preclude summary judgment on this basis. Therefore, the retaliation claims, at least for
summary judgment purposes, rest on whether Plaintiff performed her job according to
Defendant's legitimate expectations. This court has already found that for purposes of

summary judgment, Plaintiff has raised a genuine issue of material fact with regards to whether she was performing her job according to Defendant's legitimate expectations, therefore, summary judgment is denied on Plaintiff's retaliation claims.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion for Summary Judgment [14] is DENIED.

(2) Plaintiff may proceed to trial on each count alleged in Plaintiff's First Amended Complaint [3].

(3) The jury trial scheduled for January 23, 2012, at 9:00 a.m. is VACATED.

(4) The final pretrial conference scheduled for January 6, 2012, at 11:00 a.m., is converted to a status conference by personal appearance.

(5) The parties are directed to contact Magistrate Judge John A. Gorman's chambers, in Peoria, Illinois, to schedule a settlement conference to be held prior to the status conference in this court on January 6, 2012, at 11:00 a.m..

ENTERED this 9th day of November, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE